In re Petition Objecting to the Nominating Petition and/or Papers of Paul W. CA-PRA as Republican Candidate for the Warwick Township Board of Supervisors for the Municipal Primary Election for the Year 1997.

**Appeal of David JESKIE, Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 15, 1997.

Decided April 22, 1997.

Michael S. Goodwin, New Britain, for appellant.

No appearance entered for appellee.

Before COLINS, President Judge, DOYLE, J., and MIRARCHI, Jr., Senior Judge.

DOYLE, Judge.

David Jeskie appeals a decision of the Court of Common Pleas of Bucks County which denied his Petition to Set Aside the Nominating Petition of Paul W. Capra as a Republican candidate for the Warwick Township Board of Supervisors for the municipal primary scheduled for May 20, 1997.

On March 10, 1997, Capra filed his nomination petition, seeking to be placed on the Republican ballot for the primary election. Prior to that date, on March 7, 1997, Capra invited Larry Edwards, an incumbent Supervisor on the Township Board of Supervisors, to his home and asked Edwards to deliver Capra's Statement of Financial Interests, the filing of which is required by Section 4(b)(2) of the Public Officials and Employee Ethics

Act (Ethics Act),[1] to the Warwick Township office. Edwards, however, did not deliver Capra's financial interest statement to the Warwick Township Office until March 12, 1997, which was one day after the deadline for doing so.[2]

On March 17, 1997, Jeskie filed a Petition to Set Aside the Nominating Petition of Capra on the basis that Capra failed to file the required financial interest statement in a timely manner. A hearing was held before the Court of Common Pleas of Bucks County on March 21, 1997. By opinion and order dated April 4, 1997, the trial court denied Jeskie's Petition to Set Aside Capra's Nominating Petition, concluding that "the submission to the chairman of the board of township supervisors of the financial statement constitutes filing the statement with the governing authority of the political subdivision for which Capra aspires to become a candidate." This appeal ensued.[3]

■ On appeal, Jeskie argues that the trial court erred in holding that the delivery of the Statement of Financial Interests to an incumbent member of the Township Board of Supervisors at Capra's home on March 7, 1997, constituted "filing" the statement with "the governing authority of the political subdivision" required by Section 4(b)(2) of the Ethics Act. After a review of the record and relevant case law, we must agree and, accordingly, reverse the order of the Common Pleas Court.

Section 4(b)(2) of the Ethics Act provides as follows:

(2) Any candidate for county-level or local office shall file a statement of financial interests for the preceding calendar year with the governing authority of the political subdivision in which he is a candidate on or before the last day for filing a petition to appear on the ballot for election. A

copy of the statement of financial interests shall also be appended to such petition.

65 P.S. § 404(b)(2) (emphasis added). Furthermore, Section 4(b)(3) of the Ethics Act provides in pertinent part as follows:

(3) ... Failure to file the statement in accordance with the provisions of this act shall, in addition to any other penalties provided, be a fatal defect to a petition to appear on the ballot.

65 P.S. § 404(b)(3).[4]

We first observe that, even from a cursory reading of Section 4(b)(2), it is abundantly clear that there are two "filings" required under the Ethics Act: first, the original statement of financial interests must be filed with the "governing authority" of the political subdivision in which the individual is a candidate; and second, a copy of that statement must be attached to the candidate's nomination petition. Attaching a copy of the statement to the nominating petition alone and filing it with the county election board will obviously not satisfy both filing requirements under the Ethics Act.

The facts in this present appeal are nearly identical to those before this Court in *In re Petition of Cioppa*, 139 Pa.Cmwlth. 314, 590 A.2d 821 (1991), *rev'd per curiam*, 527 Pa. 284, 590 A.2d 752 (1991) (without opinion), *supplemented*, 533 Pa. 564, 626 A.2d 146 (1993). In *Cioppa*, three prospective candidates for council seats in the Borough of Braddock Hills purported to "file" the required financial interest statements by hand-delivering them, via one particular candidate, to a Braddock Hills council member prior to the filing deadline. The councilman accepted the statements from the prospective candidate and assured the candidate that he would deliver the three statements to the Borough Secretary that evening. However, after be-

---

1. Act of October 4, 1978, P.L. 883, June 26, 1989, P.L. 26, *as reenacted and amended*, June 26, 1989, P.L. 26, 65 P.S. § 404(b)(2).

2. The last permissible date for filing a candidate's nomination petition for the May 1997 primary election was Tuesday, March 11, 1997.

3. It should be noted that Capra did not file a brief with this Court or appear at oral argument.

4. This provision of Section 4(b)(3) of the Ethics Act was enacted by the General Assembly in response to the decision of our Supreme Court in *State Ethics Commission v. Baldwin*, 498 Pa. 255, 445 A.2d 1208 (1982), in which the Court held that the failure to file a statement of financial interests was *not* fatal to a candidacy for public office.

coming involved in a borough meeting, the councilman forgot to deliver the statements that evening as promised and did not deliver them to the Borough Secretary until after the filing deadline.

By opinion dated April 25, 1991, this Court ultimately held in *Cioppa* that the nomination petitions of the candidates should be set aside, reasoning that the candidates had failed to comply with Section 4(b)(2) of the Ethics Act when the financial interest statements were merely handed to a council member and not otherwise filed in a timely manner.

■ Shortly thereafter, the Supreme Court reversed our decision by a per curiam order dated May 10, 1991. *In re Petition of Cioppa,* 527 Pa. 619, 590 A.2d 759 (1991). An opinion was authored pursuant to the per curiam order over two years later in *In re Petition of Cioppa,* 533 Pa. 564, 626 A.2d 146 (1993). By this time, the relevant election had occurred, all of the candidates at issue had appeared on the ballot, and some of the candidates had been elected into office. In the Supreme Court's plurality opinion, the Court ultimately reaffirmed its previous per curiam order, which reversed the decision of this Court, *but* acknowledged that the reasoning of this Court in *Cioppa* was correct and appropriate under the circumstances:

> When we entered our orders reversing the Commonwealth Court, our foremost concern was to insure that the challenged candidates' names appeared on the ballot given the time constraints imposed by the fast-approaching primary election. This concern was chiefly motivated by our perception that in each of these cases the spirit of the Ethics Act was complied with and to permit forfeiture of a candidacy would be too harsh a result in view of our liberal policy in this Commonwealth to favor enfranchisement. **However, upon further review of the legislative mandate and its history, we are now convinced that the Commonwealth Court properly decided these cases, and that our May 10, 1991, orders reversing the Commonwealth Court were ill-advised.**
>
> We are now left with the question of crafting a remedy in this case. As a result of our May 10, 1991, orders, the six candidates involved here were permitted to appear on the primary ballot. To now void the results of an election where all candidates were submitted to the voters, with late but nonetheless filed financial statements which left adequate time for study by the electorate, would be an unnecessary disenfranchisement.

533 Pa. at 569–70, 626 A.2d at 149 (emphasis added). The Court went on to say:

> [I]n the spirit of liberality in construing our Election Code, we decline to vacate our previous orders [which reversed the decision of the Commonwealth Court]. However, the rationale expressed in this opinion shall operate prospectively. **In short, hereafter failure to file the requisite financial interest statement within the prescribed time shall be fatal to a candidacy.**

533 Pa. at 570–71, 626 A.2d at 149 (emphasis added). The only logical conclusion to be drawn from this language is that the delivery of the financial interest statements by the candidates to some person serving on the "governing authority" is insufficient to constitute a timely filing under Section 4(b)(2) of the Ethics Act.

Furthermore, it is clear that the reversal of this Court's decision in *Cioppa* was primarily the product of the exigencies of that particular case and that this Court's *decision and rationale* remains precedential for the issue implicated by the instant matter, despite the fact that the *order* of this Court was reversed on appeal.[5] Consequently, we find

---

5. The trial court's opinion in this present appeal states that "the results of the Supreme Court orders [in *Cioppa* ] reversing the Commonwealth Court remained in effect and essentially constitute a determination that the Commonwealth Court had decided these cases improperly." The language of the Supreme Court, however, clearly demonstrates that the trial court erred in reaching this conclusion. Moreover, this Court has followed the case precedent established by our opinion in *Cioppa* subsequent to the Supreme Court's *Cioppa* opinion. *See In re Friedenberg,* —— Pa.Cmwlth. ——, 657 A.2d 1382 , *petition for allowance of appeal granted,* 541 Pa. 645, 663 A.2d 696 (1995).

our reasoning in *Cioppa* to be exceptionally persuasive in this regard.

In our opinion in *Cioppa*, we stated as follows:

> While we agree that there may be circumstances where a Councilmember or a Township Supervisor may receive the forms because of the "practical necessity" of the way the Borough or the Township operates, political culture is not itself sufficient to determine who is the governing authority. Braddock Hills has established a "seat of government," a borough building with full[-]time employees to serve as the locus of municipal activities. It's at that location where records are kept, papers are served and documents filed, including statements of financial responsibility.... Because it is necessary for a political subdivision to have order in the manner in which documents are to be filed, unless there is a showing of "practical necessity" for a document to be received otherwise, a Statement of Financial Interest is not filed until received by the Office of the Borough Secretary.

*Id.* 590 A.2d at 823 (footnote omitted).

Similarly, in the appeal now before us, Warwick Township has a comparable "seat of government" where the required financial interest statement should have been filed. In fact, the appropriate place to file the financial interest statement was the very place where Capra asked Edwards to file it for him in the first place. At the hearing, Joseph Czajkowski, Township Manager and Secretary, testified as follows:

Q: Mr. Czajkowski, it's correct that you are the township manager and secretary?

A: Yes.

Q: Is that a full-time position for you?

A: Yes.

Q: Does the township maintain a township office which is manned during all business hours?

A: Yes.

Q: Who's there in addition to yourself?

A: The receptionist/billing secretary, she[ ][has] two functions, the administrative secretary, two finance people and building zoning officer.

Q: Is the township office that you've described, the place that's, at least by custom, designated for the submission of documents to the township?

A: Yes, it is.

Q: And a stamp is maintained there to provide the date and time for marking documents that are filed?

A: The date, not the time.

. . . .

Q: Were you present in the township building during the date of [March] 11th?

A: Yes, I was.

Q: The day that the financial disclosure statement ... must be filed. Were you there the entire day?

A: Yes, with probably the exception of lunch.

Q: And in your absence, do you make certain that someone is there to take care of business?

A: Yes. I have instructions in this particular case, for all of the women in the office to date stamp these items.

Q: Everyone is authorized to receive papers?

A: Yes.

(Notes of Testimony (N.T.), 3/21/97, at 20–22.)

Additionally at the March 21, 1997 hearing, Capra testified as follows:

Q: When you gave [the state of financial interest] to Mr. Edwards, you expected him to take that to the township office?

A: I expected him to file it for me, yes. I asked him to.

Q: And that would have been in the township office?

A: Yes. Yes, I did.

(N.T., 3/21/97, at 13.) Furthermore, Edwards testified as follows:

Q: Do you recall receiving the statement of financial interest from Mr. Capra in this case?

A: Yes, I do.

Q: Tell us when and under what circumstances.

A: I went—he gave me a call. I went down to his house. It was around 7 or 7:30, I believe, and he asked me if I would file these papers.

Q: What day was that?

A: That was on Friday, March 7th. And he asked would I file the papers, and I said I'd be happy to do it for him.

(N.T., 3/21/97, at 15.)

Although handing the documents to the an incumbent township supervisor may have been convenient, Capra has not shown that there was any "practical necessity" for doing so. The evidence adduced at the hearing demonstrates that Capra knew where and how to file the financial interest statement and that there existed a central repository for the filing of such statements, *i.e.*, the Warwick Township office. Moreover, the fact that Capra gave the statement to Edwards with the understanding that Edwards would "file it for him" indicates that the March 7th exchange was not regarded by either man as the act of filing the statement with the "governing authority of the political subdivision." [6]

Accordingly, for the foregoing reasons, we hold that Capra failed to file the Statement of Financial Interests in a timely manner, that the trial court erred in concluding to the contrary, and reverse the decision of the court below.[7]

---

6. There are also crucial and overriding policy concerns which dictate the result we have reached in this appeal, and here we refer to the well-reasoned and thorough opinion of Judge Carmen D. Minora, which we adopted in *In re Nominating Petition of Olshefski*, 692 A.2d 1168 (Pa.Cmwlth.1997), an opinion filed contemporaneously herewith. Our opinion in this case, in conjunction with the opinion filed in the *Olshefski* case, resolves any doubt as to the precedential value of this Court's opinion in *Cioppa* by reaffirming the legal principles enunciated therein.

7. We note that, as we recognized in *Cioppa*,

The difficulty with this case is that political subdivisions of this Commonwealth are so varied that how and to whom the Statements are to be filed are different, depending on both the type and size of the political subdivisions. In large political subdivisions, the issue becomes out of a multitude of offices it maintains, where do you file, e.g., the Mayor or Council or the Controller. However, in small [or rural]

political subdivisions, but by far the most numerous, the issue is not what office but how do you file it.

590 A.2d at 823 n. 2. With the present absence of uniformity, and considering the vast diversity of Pennsylvania's local governments, there now exists a great potential for unwary candidates to be precluded from running for public office due to this procedural technicality. Not including the 501 school districts and the 67 counties of Pennsylvania (6 of which have home rule charters), as of April 1997, there were 2,571 municipal corporations in our Commonwealth: 56 cities (19 home rule), 966 boroughs (19 home rule), 91 first class townships (12 home rule), 1457 second class townships (15 home rule), and one incorporated town (Bloomsburg in Columbia County). *Center for Local Government Services, Department of Community and Economic Development, Pennsylvania Local Fact Sheet* (April 1997). Consequently, given the absence of adequate guiding statutory provisions, we invite the General Assembly to lend its attention to the problem.